**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| ARMIN ISIP and MATHEW GEORGE, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| INDEPENDENT LIVING SYSTEMS, LLC, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Armin Isip and Mathew George ("Plaintiffs"), by and through the undersigned counsel, bring this class action complaint against Independent Living Systems, LLC, ("ILS" or "Defendant") on behalf of themselves and all others similarly situated ("Class Members"). Plaintiffs make the following allegations based upon personal knowledge as to their own actions and upon information and belief as to all other matters.

## NATURE OF THE CASE

1.       Plaintiffs bring this class action against ILS for its failure to secure and safeguard personally identifiable information ("PII")[1] and protected health information ("PHI")[2] (collectively, "Confidential Information") of more than 4.2 million individuals and for failing to provide timely, accurate, and adequate notice to Plaintiffs and Class Members that their Confidential Information had been compromised.

---

[1] PII is information that is used to confirm an individual's identity, and in this instance includes an individual's name, address, email address, phone number, and Social Security number.
[2] PHI is any information about health status, provision of health care, or payment for health care that is created or collected in the course of providing a health care service and can be linked to a specific individual.

2.      ILS is a Florida-based health services company that holds itself out as "offer[ing] a comprehensive range of turnkey payer services including clinical and third-party administrative services to managed care organizations and providers that serve high-cost, complex member populations in the Medicare, Medicaid and Dual-Eligible Market."[3]

3.      On or about March 14, 2023, ILS began notifying state attorneys general and affected individuals that it had sustained a massive data breach in which a hacker gained unauthorized access to its network between June 30 and July 5, 2022 (the "Data Breach").

4.      ILS admits that during that period, "[s]ome information stored on the ILS network was acquired by the unauthorized actor, and other information was accessible and potentially viewed."[4]

5.      ILS admits the hacker accessed highly-sensitive Confidential Information on ILS's network, including individuals' full name, date of birth, Social Security number, medical record number, clinical integrated network ("CIN") number, treatment information, food delivery information, admission date, billing/claims information, and health insurance information.

6.      ILS admits that the Data Breach has compromised the Confidential Information of over 4.2 million individuals.

7.      ILS discovered the unauthorized access on July 5, 2022, but failed to inform the public of the Data Breach until more than eight months later.

---

[3] https://ilshealth.com/about-ils/ (last visited April 13, 2023).
[4] Exhibit 1 to ILS's notice of data breach to Maine Attorney General, available at https://apps.web.maine.gov/online/aeviewer/ME/40/aacdb720-e082-4ef6-b7e6-f03280b2c4ec.shtml (last visited April 13, 2023).

8.      The Data Breach occurred because ILS negligently failed to implement reasonable security procedures and practices, failed to disclose material facts surrounding its deficient data security protocols, and failed to timely notify the victims of the Data Breach.

9.      As a result of ILS's failure to protect the sensitive information it was entrusted to safeguard, Plaintiffs have already suffered identity theft and fraud, and Plaintiffs and Class Members also now face a significant risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

## PARTIES

10.      Plaintiff Armin Isip is a resident of North Hills, California. In late March 2023, Ms. Isip was notified via letter dated March 14, 2023, that she is a victim of the Data Breach.

11.      Plaintiff Mathew George is a resident of Denver, Colorado. In late March 2023, Mr. George was notified via letter dated March 14, 2023, that he is a victim of the Data Breach.

12.      Defendant Independent Living Systems, LLC, is a Florida limited liability company with its principal place of business located at 4601 NW 77th Avenue, Miami, Florida 33166. According to ILS's website, ILS "is a business associate to its covered entity subsidiaries Florida Community Care LLC and HPMP of Florida Inc. d/b/a Florida Complete Care."[5]

## JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists because ILS and at least one Class Member are citizens of different States. This Court also has supplemental jurisdiction over the claims in this

---

[5] https://ilshealth.com/supplemental-data-notice/ (last visited April 13, 2023)

case pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy under Article III of the United States Constitution.

14.     The Court has personal jurisdiction over ILS because ILS is headquartered in and organized under the laws of Florida and is thus essentially at home there. ILS also conducts substantial business in Florida related to Plaintiffs and Class Members and has thereby established minimum contacts with Florida sufficient to authorize this Court's exercise of jurisdiction over ILS as to the claims of Plaintiffs and Class Members.

15.     Venue in the Southern District of Florida is proper under 28 U.S.C. § 1391 because ILS resides in this District, a substantial part of the conduct giving rise to Plaintiffs' and Class Members' claims occurred in this District, and a substantial part of property that is the subject of the action is situated in this District.

## FACTUAL ALLEGATIONS

### *ILS's Privacy Practices*

16.     ILS "provides a variety of managed services to several partner health plans and their enrollees or referred individuals. ILS's services include plan administration, nutrition support, and comprehensive care management."[6]

17.     In the course of providing these services, ILS collects individuals' PII and PHI. As a result, these individuals' highly-sensitive Confidential Information is stored on centralized servers maintained by ILS.

_____

[6] Exhibit A to Exhibit 1 to ILS's notice of data breach to Maine Attorney General, available at https://apps.web.maine.gov/online/aeviewer/ME/40/aacdb720-e082-4ef6-b7e6-f03280b2c4ec.shtml (last visited April 13, 2023).

18.    ILS maintains a privacy policy ("Privacy Policy"), that is accessible from its website.[7] In its Privacy Policy, ILS admits that "We are required by law to maintain the privacy and security of your protected health information." ILS then states that "We implement a variety of security measures to maintain the safety of your personal information when you access your personal information."

19.    ILS's Privacy Policy further states that "[w]e do not sell, trade, or otherwise transfer to outside parties your personally identifiable information" and that "[w]e will promptly notify you if a breach occurs that may have compromised the privacy or security of your information."

20.    ILS's Privacy Policy finally states that "BY USING OUR WEBSITE, YOU SIGNIFY YOUR ACCEPTANCE OF THIS PRIVACY POLICY."

21.    By obtaining, collecting, and storing the Confidential Information of Plaintiffs and Class Members, ILS assumed legal and equitable duties and knew or should have known it was responsible for protecting the Confidential Information from unauthorized disclosure.

### The Data Breach

22.    Between June 30 and July 5, 2022, a hacker infiltrated ILS's network and accessed a treasure trove of highly sensitive PII and PHI of more than 4.2 million individuals stored on ILS's servers.

23.    ILS did not begin publicly disclosing the existence of the Data Breach until more than eight months later, on or about March 14, 2023, when it began notifying state attorneys general and affected individuals.

24.    In its notice to state attorneys general, ILS vaguely described the Data Breach:

---

[7] ILS's Privacy Policy is available online at https://ilshealth.com/privacy-policy/#:~:text=We%20do%20not%20sell%2C%20trade,parties%20your%20personally%20identifiable%20information (last visited April 11, 2023).

On July 5, 2022, ILS experienced an incident involving the inaccessibility of certain computer systems on its network. ILS responded to the incident immediately and began an investigation with the assistance of outside cybersecurity specialists. Through its response efforts, ILS learned that an unauthorized actor obtained access to certain ILS systems between June 30 and July 5, 2022. During that period, some information stored on the ILS network was acquired by the unauthorized actor, and other information was accessible and potentially viewed.[8]

25.     ILS's sample form notification letter repeats this description.[9]

26.     On September 2, 2022, ILS posted a "Supplemental Notice of Data Event" regarding the Data Breach on its website that includes this same description. ILS updated this notice on March 14, 2022. It is now virtually identical to its notice to state attorneys general and sample form notification letter to affected individuals.[10]

27.     Under the website post's section titled "What happened?" ILS provides affected individuals with no meaningful detail regarding the Data Breach's cause, scope, or impact, downplaying the Data Breach by offering the empty assurance that "We are unaware of any identity theft or fraud resulting from this event."[11]

28.     In contrast to ILS's softened description of the Data Breach at the beginning of its website post, under the section titled "What Information was Affected?" ILS admits that "[t]he types of impacted information varies by individual and could have included: name, address, date of birth, driver's license, state identification, Social Security number, financial account information, medical record number, Medicare or Medicaid identification, CIN#, mental or

---

[8] Exhibit 1 to ILS's notice of data breach to Maine Attorney General, available at https://apps.web.maine.gov/online/aeviewer/ME/40/aacdb720-e082-4ef6-b7e6-f03280b2c4ec.shtml (last visited April 13, 2023).

[9] Exhibit A to Exhibit 1 to ILS's notice of data breach to Maine Attorney General, available at https://apps.web.maine.gov/online/aeviewer/ME/40/aacdb720-e082-4ef6-b7e6-f03280b2c4ec.shtml (last visited April 13, 2023).

[10] https://ilshealth.com/supplemental-data-notice/ (last visited April 13, 2023).

[11] *Id.*

physical treatment/condition information, food delivery information, diagnosis code or diagnosis information, admission/discharge date, prescription information, billing/claims information, patient name, and health insurance information."[12]

29.     ILS then tacitly admits that victims of the Data Breach are at risk of harm and *places the onus on the data breach victims* by "encourag[ing] potentially affected individuals to remain vigilant against incidents of identity theft and fraud by reviewing their account statements, explanations of benefits, and credit reports carefully for unexpected activity and to report any questionable activity to the associated institutions immediately."[13]

30.     ILS's sample notification letters mimic these same admissions and empty assurances.[14]

31.     ILS provides no explanation for why it delayed notifying customers about the Data Breach for more than eight months after it detected the Data Breach. The Confidential Information of Plaintiffs and Class Members could have been in the hands of hackers for more than eight months. By waiting this long to disclose the Data Breach and by downplaying the risk that victims' Confidential Information would be misused by bad actors, ILS prevented victims from taking meaningful, proactive, and targeted mitigation measures to protect themselves from harm.

### The Data Breach was Preventable

32.     ILS states that "[w]e responded to the [Data Breach] immediately and began an investigation with the assistance of outside cybersecurity specialists" and that, in response to the Data Breach, "we promptly took steps to mitigate any risk of compromise to information and better

---

[12] *Id.*
[13] *Id.*
[14] Exhibit 1 to ILS's notice of data breach to Maine Attorney General and Exhibit A to Exhibit 1, available at https://apps.web.maine.gov/online/aeviewer/ME/40/aacdb720-e082-4ef6-b7e6-f03280b2c4ec.shtml (last visited April 13, 2023).

prevent a similar event from reoccurring. These actions included: (1) fortifying the security of our firewall; (2) utilizing the forensic specialists engaged to monitor our network and remediate any suspicious activity identified; (3) rotating and increasing the complexity of all users' credentials[;] and (4) providing notification to potentially affected individuals as quickly as possible. We are also enhancing our existing training protocols and other internal procedures that relate to data protection and secutiy."[15]

33.    But ILS, like any service provider of its size that stores valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of customer files. ILS's implementation of enhanced security measures only after the fact is inexcusable given its knowledge that it was a prime target for cyberattacks.

34.    Its status as a prime target for cyberattacks was known and obvious to ILS as it observed frequent public announcements of data breaches affecting various service providers and understood that the type of information ILS collects, maintains, and stores is highly coveted and a frequent target of hackers.

35.    Data breaches and the harm they cause have become so common and notorious the Federal Trade Commission ("FTC") has issued guidance for how to address the destruction caused by an unauthorized person having access to someone's PII: "Once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[16]

---

[15] https://ilshealth.com/supplemental-data-notice/ (last visited April 13, 2023).
[16] https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf (last accessed April 13, 2023)

36.     At all relevant times, ILS knew, or reasonable should have known, of the importance of safeguarding PII and PHI and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on affected individuals as a result of a breach.

37.     ILS was, or should have been, fully aware of the significant number of individuals whose Confidential Information it collected, and thus, the significant number of individuals who would be harmed by a breach of its systems.

38.     But despite all of the publicly available knowledge of the continued compromises of Confidential Information and despite holding the PII and PHI of millions of individuals, ILS failed to use reasonable care in maintaining the privacy and security of the Confidential Information of Plaintiffs and Class Members. Had ILS implemented common sense security measures, hackers never could have accessed millions of individuals' files and the Data Breach would have been prevented or much smaller in scope.

### *Allegations Relating to Plaintiff Armin Isip*

39.     In late March 2023, Plaintiff Armin Isip received a notification letter from ILS dated March 14, 2023, and stating that she was a victim of the Data Breach. The letter stated that "[w]e are writing to make you aware of a data incident that may impact the privacy of your personal information and/or protected health information ('PHI')."

40.     The notification letter further stated that "we conducted a comprehensive data review exercise to understand the scope of potentially affected information and identify the individuals to whom such information relates" and that "[o]n January 17, 2023, we received the results of this review and determined that the following types of information related to you were included in one or more files acquired by the unauthorized actor or present in one or more files that resided on an area of the ILS network that was accessed by the unauthorized actor: name, date

of birth, Social Security number, medial record number, CIN#, treatment information, food delivery information, admission date, billing/claims information, and health insurance information."

41.     The letter asked Plaintiff Isip to "review the information contained in the enclosed '*Steps You Can Take to Protect Information.*'"

42.     Despite making these recommendations, ILS also attempted to downplay the risk of harm, stating that "we have no evidence or other indication that identity theft or fraud occurred as a result of this incident" and that "[w]e are providing this notice out of an abundance of caution." These statements are facially dubious, as the objective of almost every data breach is to access information that can be misused for financial gain. In any event, Plaintiff Isip would not be able to inform ILS of any misuse until *after* the company actually made her aware of the Data Breach.

43.     As a result of the Data Breach, Plaintiff Isip has experienced an increase in spam phone calls, emails, and text messages.

44.     Since the breach, Plaintiff Isip has also been locked out of her Hotmail account because someone had been trying to access the account.

45.     To protect herself from additional harm, Plaintiff Isip has been forced to spend significant time and effort engaging in remedial efforts to protect her Confidential Information from additional attacks. Plaintiff Isip must now continue to spend time and effort reviewing her financial and other account statements for evidence of unauthorized activity, which she will continue to do indefinitely. Plaintiff Isip suffered significant distress knowing her Confidential Information is no longer confidential and her accounts are being targeted.

46.     Upon information and belief, ILS continues to store and/or share Plaintiff Isip's Confidential Information on its network. Thus, Plaintiff Isip has a continuing interest in ensuring that her Confidential Information is protected and safeguarded from future breaches.

### *Allegations Relating to Plaintiff Mathew George*

47.     In late March 2023, Plaintiff Mathew George received a notification letter from ILS dated March 14, 2023, and stating that he was a victim of the Data Breach. The letter stated that "[w]e are writing to make you aware of a data incident that may impact the privacy of your personal information and/or protected health information ('PHI')."

48.     The notification letter further stated that "we conducted a comprehensive data review exercise to understand the scope of potentially affected information and identify the individuals to whom such information relates" and that "[o]n January 17, 2023, we received the results of this review and determined that the following types of information related to you were included in one or more files acquired by the unauthorized actor or present in one or more files that resided on an area of the ILS network that was accessed by the unauthorized actor: name, date of birth, Social Security number, and health insurance policy number."

49.     The letter asked Plaintiff George to "review the information contained in the enclosed '*Steps You Can Take to Protect Information*.'"

50.     Despite making these recommendations, ILS also attempted to downplay the risk of harm, stating that "we have no evidence or other indication that identity theft or fraud occurred as a result of this incident" and that "[w]e are providing this notice out of an abundance of caution." These statements are facially dubious, as the objective of almost every data breach is to access information that can be misused for financial gain. In any event, Plaintiff George would not be able to inform ILS of any misuse until *after* the company actually made him aware of the Data Breach.

51.     As a result of the Data Breach, Plaintiff George has been the victim of identity theft and fraud. In August and September 2022, Plaintiff George has incurred several fraudulent charges via his debit card.

52.     Also as a result of the Data Breach, Plaintiff George experienced an increase in spam emails and text messages.

53.     To protect himself from additional harm, Plaintiff George has been forced to spend significant time and effort engaging in remedial efforts to protect his Confidential Information from additional attacks. Plaintiff George must now continue to spend time and effort reviewing his financial and other account statements for evidence of unauthorized activity, which he will continue to do indefinitely. Plaintiff George suffered significant distress knowing his Confidential Information is no longer confidential and his accounts are being targeted.

54.     Upon information and belief, ILS continues to store and/or share Plaintiff George's Confidential Information on its network. Thus, Plaintiff George has a continuing interest in ensuring that her Confidential Information is protected and safeguarded from future breaches.

### ILS Failed to Comply with Federal Law and Regulatory Guidance

55.     Federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission (FTC) has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[17]

---

[17] https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited April 14, 2023).

56.     The FTC's publication Protecting Personal Information: A Guide for Business sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data.[18] Among other things, the guidelines note that businesses should (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[19]

57.     Additionally, the FTC recommends that organizations limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security; monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[20] This is consistent with guidance provided by the FBI.

58.     The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[21]

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited April 13, 2023).

59.     ILS was fully aware of its obligation to implement and use reasonable measures to protect the PII of its customers but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. ILS's failure to employ reasonable measures to protect against unauthorized access to patient information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

60. ILS also failed to meet the minimum standards of the National Institute of Standards and Technology ("NIST") Cybersecurity Framework Version 1.1[22] (including without limitation) PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2).

### *The Impact of the Data Breach on Victims*

61.     ILS's failure to keep Plaintiffs' and Class Members' Confidential Information secure has severe ramifications. Given the sensitive nature of the Confidential Information stolen in the Data Breach—names, Social Security numbers, health information, insurance information, and payment information—hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future. As a result, Plaintiffs have suffered injury and faced an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

62.     The Confidential Information exposed in the Data Breach is highly coveted and valuable on underground markets as it can be used to commit identity theft and fraud. Malicious actors use PII and PHI to, among other things, gain access to consumers' bank accounts, social media, and credit cards. Malicious actors can also use individuals' PII and PHI to open new

---

[22] https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf (last visited April. 11, 2023)

financial records, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities."[23]

63.     Further, malicious actors often wait months or years to use the PII and PHI obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. There may also be a significant time lag between when PII or PHI is stolen and when it is misused for fraudulent purposes. These bad actors will also re-use stolen PII and PHI, meaning individuals can be the victims of several cybercrimes stemming from a single data breach. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[24]

64.     Victims of the Data Breach face significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and healthcare statements, checking credit reports, and spending time and effort searching for and responding to unauthorized activity.

---

[23] A criminal combines real and fake information to create a new "synthetic identity," which is used to commit fraud.
[24] http://www.gao.gov/new.items/d07737.pdf (last visited April 13, 2023).

65.     It is no wonder then that identity theft exacts a severe emotional toll on its victims. The 2017 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed;

- 67% reported anxiety;

- 66% reported feelings of fear related to personal financial safety;

- 37% reported fearing for the financial safety of family members;

- 24% reported fear for their physical safety;

- 15.2% reported a relationship ended or was severely and negatively impacted by the identity theft; and

- 7% reported feeling suicidal.[25]

66.     Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[26]

---

[25] https://www.idtheftcenter.org/images/page-docs/Aftermath_2017.pdf (last visited Apri. 11, 2023).
[26] *Id.*

67.     The unauthorized disclosure of sensitive PII and PHI to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[27]

68.     Individuals are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

69.     As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

     a.  the unconsented disclosure of confidential information to a third party;

     b.  losing the inherent value of their PII and PHI;

     c.  losing the value of the access to their PII and PHI permitted by ILS.

     d.  losing the value of the explicit and implicit promises of data security;

     e.  identity theft and fraud resulting from the theft of their PII and PHI;

     f.  costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

     g.  anxiety, emotional distress, and loss of privacy;

     h.  costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

---

[27] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

     i.   unauthorized charges and loss of use of and access to their accounts;

     j.   lowered credit scores resulting from credit inquiries following fraudulent activities;

     k.  costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

     l.   the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

70.     Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again, as there is typically significant time and effort associated with seeking reimbursement.

71.     Plaintiffs and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[28]

72.     Likewise, the American Bankers Association, reporting on a global consumer survey regarding concerns about privacy and data security, noted that 29% of consumers would avoid using a company that had experienced a data breach, with 63% of consumers indicating they would avoid such a company for a period of time.[29]

---

[28] https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited April 13, 2023).
[29] https://bankingjournal.aba.com/2019/09/what-compliance-needs-to-know-in-the-event-of-a-security-breach/ (last visited April 13, 2023).

73.     Plaintiffs and Class Members have a direct interest in ILS's promises and duties to protect their Confidential Information, *i.e.*, that ILS *not increase* their risk of identity theft and fraud. Because ILS failed to live up to its promises and duties in this respect, Plaintiffs and Class Members seek the present value of identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by ILS's wrongful conduct. Through this remedy, Plaintiffs seek to restore themselves and Class Members as close to the same position as they would have occupied but for ILS's wrongful conduct, namely its failure to adequately protect Plaintiffs' and Class Members' Confidential Information.

74.     Plaintiffs and Class Members further seek to recover the value of the unauthorized access to their Confidential Information permitted through ILS's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII or PHI is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiffs and Class Members have a protectible property interest in their Confidential Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

75.     ILS's delayed notice letter also caused Plaintiff and Class Members harm. For example, ILS provided no context for its repeated unsubstantiated statement that "we have no evidence or other indication that identity theft or fraud occurred as a result of this incident," as the objective of almost every data breach is to gain access to an organization's sensitive data so that the data can be misused for financial gain. Furthermore, the letter did not explain the precise nature of the attack, the identity of the hackers, or the number of individuals affected. ILS's decision to withhold these key facts is significant because affected individuals may take different precautions depending on the severity and imminence of the perceived risk. By waiting more than eight months to disclose the Data Breach and by downplaying the risk of misuse, ILS prevented victims from taking meaningful, proactive, and targeted mitigation measures to secure their Confidential Information and accounts.

76.     Plaintiffs and Class Members have an interest in ensuring that their Confidential Information is secured and not subject to further theft because ILS continues to hold their Confidential Information.

## CLASS ACTION ALLEGATIONS

77.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of the following nationwide class (the "Nationwide Class"):

> **All individuals residing in the United States who were notified by Defendant that their Confidential Information may have been compromised in the Data Breach.**

78.     Pursuant to Fed. R. Civ. P. 23(c)(5), Plaintiffs seek certification of the following subclass (the "California Subclass"):

> **All individuals residing in California who were notified by Defendant that their Confidential Information may have been compromised in the Data Breach.**

79.     The foregoing Nationwide Class and California Subclass are referred to herein collectively as the "Class."

80.     Specifically excluded from the Class are ILS and its officers, directors, or employees; any entity in which ILS has a controlling interest; and any affiliate, legal representative, heir, or assign of ILS. Also excluded from the Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

81.     **Ascertainablity.** The members of the Class are readily identifiable and ascertainable. ILS and/or its affiliates, among others, possess the information to identify and contact Class Members.

82.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that joinder of all of them is impracticable. ILS's statements reveal that the Class contains more than 4.2 million individuals whose Confidential Information was compromised in the Data Breach.

83.     **Typicality: Federal Rule of Civil Procedure 23(a)(3).** As to the Class, Plaintiffs' claims are typical of the claims of the Members because all Class Members had their Confidential Information compromised in the Data Breach and were harmed as a result.

84.     **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no known interest antagonistic to those of the Class, and their interests are aligned with Class Members' interests. Plaintiffs were subject to the same Data Breach as Class Members, suffered similar harms, and face similar threats due to the Data Breach. Plaintiffs have also retained competent counsel with significant experience litigating complex class actions, including Data Breach cases.

85.     **Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** There are questions of law and fact common to the Class such that there is a well-defined community of interest in this litigation. These common questions predominate over any questions affecting only individual Class Members. The common questions of law and fact include, without limitation:

    a.  Whether ILS owes Plaintiffs and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their Confidential Information;

    b.  Whether ILS breached an agreement with Plaintiffs and Class Members to keep their Confidential Information confidential;

    c.  Whether ILS received a benefit without proper restitution making it unjust for ILS to retain the benefit without commensurate compensation;

    d.  Whether ILS acted negligently in connection with the monitoring and/or protection of Plaintiffs' and Class Members' Confidential Information;

    e.  Whether ILS violated its duty to implement reasonable security systems to protect Plaintiffs' and Class Members' Confidential Information;

    f.  Whether ILS's breach of its duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiffs and Class Members;

    g.  Whether ILS provided timely notice of the Data Breach to Plaintiffs and Class Members; and

    h.  Whether Plaintiffs and Class Members are entitled to compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the Data Breach.

86.     ILS has engaged in a common course of conduct, and Plaintiffs and Class Members have been similarly impacted by ILS's failure to maintain reasonable security procedures and practices to protect individuals' Confidential Information, as well as ILS's failure to timely alert affected individuals to the Data Breach.

87.     **Superiority: Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal

litigation. Absent a class action, most if not all Class Members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under the applicable rules.

## **CLAIMS FOR RELIEF**

### **COUNT I**
**Negligence**
*(On Behalf of Plaintiffs and the Class)*

88.     Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

89.     ILS owed Plaintiffs and Class Members a duty to exercise reasonable care in protecting their Confidential Information from unauthorized disclosure or access.

90.     ILS owed a duty of care to Plaintiffs and Class Members to provide adequate data security, consistent with industry standards, to ensure that ILS's systems and network adequately protected the Confidential Information.

91.     ILS's duty to use reasonable care in protecting Confidential Information arises as a result of the parties' relationship, as well as common law and federal law, and ILS's own policies and promises regarding privacy and data security.

92.     ILS's duties also arise from the Federal Trade Commission Act ("FTC Act") and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations.

93.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as ILS, of failing to use reasonable measures to protect PII and PHI. 15 U.S.C. § 45(a)(1).

94.     The FTC publications and orders described above also form part of the basis of ILS's duty in this regard.

95.     ILS violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and failing to comply with applicable industry standards. ILS's conduct was unreasonable given the nature and amount of PII they obtained, stored, and disseminated in the regular course of their business, and the foreseeable consequences of a data breach, including, specifically, the significant damage that would result to Plaintiff and Class Members.

96.     45 C.F.R. § 164.104 states that the "standards, requirements, and implementation specifications adopted under this part" apply to covered entities and their business associates, such as ILS. ILS is therefore an entity covered by HIPAA and required to comply with all rules and regulations under 45 C.F.R. Parts 160 and 164.

97.     45 C.F.R. Part 164 governs "Security and Privacy," with Subpart A providing "General Provisions," Subpart B regulating "Security Standards for the Protection of Electronic Protected Health Information," Subpart C providing requirements for "Notification in the Case of Breach of Unsecured Protected Health Information," and Subpart E governing "Privacy of Individually Identifiable Health Information."

98.     ILS violated HIPAA by failing to adhere to and meet the required standards as set forth in 45 C.F.R. §§ 164.308, 164.310, 164.312, 164.314, and 164.316.

99.     In addition, HIPAA regulations require covered entities "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach" to "notify each

individual whose unsecured protected health information has been, or is reasonably believed by the covered entity to have been, accessed, acquired, used, or disclosed as a result of" a data breach. 45 C.F.R. § 164.404. The notice must also contain a minimum amount of information regarding the breach (including the dates of the breach and its discovery), the types of protected health information that were involved, steps individuals should take to protect themselves from harm resulting from the breach, a description of what the entity is doing to investigate the breach and mitigate harm, and contact information to obtain further information. *Id.*

100. ILS breached its notification obligations under HIPAA by failing to give timely and complete notice of the breach to Plaintiffs and Class Members.

101. HIPAA also requires ILS to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). The Confidential Information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

102. HIPAA further requires ILS to disclose the unauthorized access and theft of the PHI to Plaintiffs and Class Members "without unreasonable delay" so that Plaintiffs and Class Members can take appropriate measures to mitigate damages, protect against adverse consequences, and detect misuse of their PHI. *See* 45 C.F.R. § 164.404.

103. Plaintiffs and Class Members are within the class of persons that the FTC Act and HIPAA were intended to protect.

104. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act and HIPAA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and

avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

105.     ILS's violations of Section 5 of the FTC Act and HIPAA therefore constitute negligence *per se*.

106.     ILS knew, or should have known, of the risks inherent in collecting and storing PII and PHI in a centralized location, ILS's vulnerability to network attacks, and the importance of adequate security.

107.     ILS breached its duty to Plaintiffs and Class Members in numerous ways, as described herein, including by:

    a.  Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the Confidential Information of Plaintiffs and Class Members;

    b.  Failing to comply with industry standard data security measures leading up to the Data Breach;

    c.  Failing to comply with its own Privacy Policy;

    d.  Failing to comply with regulations protecting the Confidential Information at issue during the period of the Data Breach;

    e.  Failing to adequately monitor, evaluate, and ensure the security of ILS's network and systems;

    f.  Failing to recognize in a timely manner that Confidential Information had been compromised; and

    g.  Failing to timely and adequately disclose the Data Breach.

108.     Plaintiffs' and Class Members' Confidential Information would not have been compromised but for ILS's wrongful and negligent breach of its duties.

109.     ILS's failure to take proper security measures to protect the Confidential Information of Plaintiffs and Class Members created conditions conducive to a foreseeable,

intentional criminal act, namely the unauthorized access and exfiltration of Confidential Information by unauthorized third parties. Given that health services providers are prime targets for hackers, Plaintiffs and Class Members are part of a foreseeable, discernible group that was at high risk of having their Confidential Information misused or disclosed if not adequately protected by ILS.

110.    It was also foreseeable that ILS's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiffs and Class Members.

111.    As a direct and proximate result of ILS's conduct, Plaintiffs and Class Members have and will suffer damages including: (i) the loss of rental or use value of their Confidential Information; (ii) the unconsented disclosure of their Confidential Information to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Confidential Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Confidential Information, which remains in ILS's possession and is subject to further unauthorized disclosures so long as ILS fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Confidential Information for the rest of their lives; and (ix) any nominal damages that may be awarded.

**COUNT II**
**Unjust Enrichment**
*(On Behalf of Plaintiffs and the Class)*

112.    Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 through 87.

113.    Plaintiffs and Class Members have an interest, both equitable and legal, in their Confidential Information that was conferred upon, collected by, and maintained by ILS and which was stolen in the Data Breach. This information has independent value.

114.    Plaintiffs and Class Members conferred a monetary benefit on ILS in the form of payments for services, including those paid indirectly by Plaintiffs and Class Members to ILS.

115.    ILS appreciated and had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

116.    The price for ILS's services that Plaintiffs and Class Members paid (directly or indirectly) to ILS should have been used by ILS, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

117.    Likewise, in exchange for receiving Plaintiffs' and Class Members' valuable Confidential Information, which ILS was able to use for their own business purposes and which provided actual value to ILS, ILS was obligated to devote sufficient resources to reasonable data privacy and security practices and procedures.

118.    As a result of ILS's conduct, Plaintiffs and Class Members suffered actual damages as described herein. Under principals of equity and good conscience, ILS should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds they received as a result of ILS's inequitable conduct, including an amount equaling the difference in value between services that included implementation of reasonable data privacy and security practices that Plaintiffs and Class Members paid for and the services without

reasonable data privacy and security practices that they actually received, and the amount of profit ILS made from Plaintiffs' and Class Members' accounts and Confidential Information while failing to protect their Confidential Information.

**COUNT III**
**Invasion of Privacy**
***(On Behalf of Plaintiffs and the Class)***

119.    Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 through 87.

120.    Plaintiffs and Class Members shared Confidential Information with ILS and/or its affiliates that Plaintiffs and Class Members wanted to remain private and non-public.

121.    Plaintiffs and Class Members reasonably expected that the Confidential Information they shared with ILS would be protected and secured against access by unauthorized parties and would not be disclosed to or obtained by unauthorized parties, or disclosed or obtained for any improper purpose.

122.    ILS intentionally intruded into Plaintiffs' and Class Members' seclusion by disclosing without permission their Confidential Information to a third party who could have sold their Confidential Information to other third-parties on the dark web.

123.    By failing to keep Plaintiffs' and Class Members' Confidential Information secure, and disclosing Confidential Information to unauthorized parties for unauthorized use, ILS unlawfully invaded Plaintiffs' and Class Members' privacy right to seclusion by, *inter alia*:

      a.   Intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

      b.   Invading their privacy by improperly using their Confidential Information properly obtained for another purpose, or disclosing it to unauthorized persons;

      c.   Failing to adequately secure their Confidential Information from disclosure to unauthorized persons; and

      d.   Enabling the disclosures of their Confidential Information without consent.

29

124.    The Confidential Information that was compromised during the Data Breach was highly sensitive, private, and confidential, as it included Social Security numbers, health-related information, and other information that is the type of sensitive, personal information that one normally expects will be protected from exposure by the entity charged with safeguarding it.

125.    ILS's intrusions into Plaintiffs' and Class Members' seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

126.    As a direct and proximate result of ILS's invasion of privacy, Plaintiffs and Class Members suffered injury and sustained actual losses and damages as alleged herein. Plaintiffs and Class Members alternatively seek an award of nominal damages.

**COUNT IV**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**("FDUTPA"), Fla. Stat. § 501.201, *et seq.***
***(On Behalf of Plaintiffs and the Class)***

127.    Plaintiffs repeat and reallege every allegation set forth in paragraphs 1 through 87.

128.    Plaintiffs bring this action on behalf of themselves and Class Members for the relief requested above and for the public benefit to promote the public interests in the provision of truthful, fair information to allow employees and consumers to make informed purchasing decisions and to protect Plaintiffs, Class Members, and the public from ILS's unfair methods of competition and unfair, unconscionable, and unlawful practices. ILS's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

129.    ILS's offer, provision, and/or sale of services at issue in this case are "consumer transaction[s]" within the scope of the FDUTPA. *See* Fla. Stat. §§ 501.201-501.

130.    Plaintiffs and Class Members, as "individual[s]," are "consumer[s]" as defined by the FDUTPA. *See* Fla. Stat. § 501.203(7).

131.    ILS offered, provided, or sold services in Florida and engaged in trade or commerce directly or indirectly affecting the consuming public, within the meaning of the FDUTPA. *See* Fla. Stat. § 501.203.

132.    Plaintiffs and Class Members paid for or otherwise availed themselves and received services from ILS, primarily for personal, family, or household purposes.

133.    ILS engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the procurement or provision of employment or services to or from Plaintiffs and Class Members.

134.    ILS's acts, practices, and omissions were done in the course of ILS's businesses of offering, providing, and servicing customers throughout Florida and the United States.

135.    The unfair, unconscionable, and unlawful acts and practices of Defendant alleged herein, and in particular the decisions regarding data security, emanated and arose within the State of Florida, within the scope of the FDUTPA.

136.    ILS, headquartered and operating in and out of Florida, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following:

a.  failure to implement and maintain reasonable and adequate computer systems and data security practices to safeguard Confidential Information;

b.  omitting, suppressing, and concealing the material fact that their computer systems and data security practices were inadequate to safeguard Confidential Information from theft;

c.  failure failure to protect the privacy and confidentiality of Plaintiffs' and Class Members' Confidential Information;

d.  continued acceptance and storage of Confidential Information after ILS knew or should have known of the security vulnerabilities that were exploited in the Data Breach;

e.   continued acceptance and storage of Confidential Information after ILS knew or should have known of the Data Breach and before it allegedly remediated the Data Breach.

137.   These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including by not limited to the FTC Act, 15 U.S.C. § 41, *et seq.,* and the FDUTPA, Fla. Stat. § 501.171(2).

138.   ILS knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Class Members' Confidential Information and that the risk of a data breach or theft was high.

139.   The above unfair, unconscionable, and unlawful practices and acts by ILS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

140.   ILS's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

141.   Plaintiffs have standing to pursue this claim because as a direct and proximate result of Defendant's violations of the FDUTPA, Plaintiff and the Nationwide Class have been "aggrieved" by a violation of the FDUTPA and bring this action to obtain a declaratory judgment that Defendant's acts or practices violate the FDUTPA. *See* Fla. Stat. § 501.211(a).

142.   Plaintiffs also have standing to pursue this claim because, as a direct result of Defendant's knowing violation of the FDUTPA, Plaintiff is at a substantial present and imminent risk of identity theft. Defendant still possesses Plaintiff's and the Nationwide Class's PII, and Plaintiff's PII has been potentially accessed by unauthorized third parties, which is evidence of a substantial and imminent risk of future identity theft for Plaintiffs and Class Members.

143.    Plaintiffs and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future identity theft, including, but not limited to:

    a.  ordering that ILS engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering prompt correction of any problems or issues detected by such third-party security auditors;

    b.  ordering that ILS engage third-party security auditors and internal personnel to run automated security monitoring;

    c.  Ordering that ILS audit, test, and train security personnel regarding any new or modified procedures;

    d.  ordering that ILS segment data by, among other things, creating firewalls and access controls so that if one area of a network system is compromised, hackers cannot gain access to other portions of the system;

    e.  ordering that ILS purge, delete, and destroy Confidential Information not necessary for its provisions of services in a reasonably secure manner;

    f.  ordering that ILS conduct regular database scans and security checks;

    g.  ordering that ILS routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

    h.  ordering ILS to meaningfully educate individuals about the threats they face as a result of the loss of their financial and Confidential Information to third parties, as well as the steps victims should take to protect themselves.

144.    Plaintiffs and Class Members are also entitled to a declaratory judgment that ILS's actions and/or practices violate the FDUTPA.

145.    Plaintiffs and Class Members are also entitled to recover the costs of this action (including reasonable attorneys' fees) and such other relief as the Court deems just and proper.

**COUNT V**
**Violation of California's Confidentiality of Medical Information Act ("CMIA")**
**Cal. Civ. Code § 56,** *et seq*.
*(On Behalf of Plaintiff Armin Isip and the California Subclass)*

146.     Plaintiff Isip repeats and realleges every allegation set forth in paragraphs 1 through 87.

147.     At all times relevant to this action, ILS was and is a provider of health care as defined and set forth in the CMIA, California Civil Code § 56, *et seq.* and maintained and continues to maintain "medical information," within the meaning of § 56.05(i), of Plaintiff Isip and the California Subclass, who are "patients" within the meaning of § 56.05(l).

148.     ILS is a "provider of health care" subject to the CMIA because it is a "business organized for the purpose of maintaining medical information, as defined [§ 56.05(j)], in order to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage his or her information, or for the diagnosis and treatment of the individual." Cal. Civ. Code § 56.05(a).

149.     Alternatively, ILS is a "contractor" pursuant to Cal. Civ. Code § 56.05(c) because it is an entity that is a medical group, independent practice association, pharmaceutical benefits manager, or a medical service organization and is not a health care service plan or provider of health care, not an insurance institution as defined in subdivision (k) of Section 791.02 of the Insurance Code, and not a pharmaceutical benefits manager licensed pursuant to the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code).

150.     As a "provider of health care" or "contractor who creates, maintains preserves, stores, abandons, destroys, or disposes of medical information," the CMIA requires that ILS "do so in a manner that preserves the confidentiality of the information contained therein." § 56.101(a).

34

151.    Plaintiff Isip and the California Subclass had their Confidential Information created, maintained, preserved, and stored on ILS's computer network at the time of the Data Breach.

152.    ILS allowed an unauthorized third party to gain access to the Confidential Information of Plaintiff Isip and the California Subclass without the prior written authorization required by § 56.10.

153.    ILS failed to create, maintain, preserve, and store the Confidential Information of Plaintiff Isip and the California Subclass in a manner that preserves the confidentiality of the information contained therein, in violation of § 56.101(a).

154.    Due to ILS's conduct described above, the Confidential Information of Plaintiff Isip and the California Subclass has been used, disclosed, and released in violation of the CMIA.

155.    ILS negligently released the Confidential Information of Plaintiff Isip and the California Subclass, in violation of the CMIA.

156.    Plaintiff Isip and the California Subclass have suffered damages, as described above, from ILS's unauthorized disclosure and release of their Confidential Information.

157.    Plaintiff Isip and the California Subclass are therefore entitled to compensatory and punitive damages under § 56.35, nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1); the amount of actual damages, if any, for each violation under Civil Code §56.36(b)(2); injunctive relief; and attorneys' fees, expenses, and costs.

## COUNT VI
### Violation of California's Customer Records Act ("CRA")
### Cal. Civ. Code § 1798.80, *et seq.*
### *(On Behalf of Plaintiff Armin Isip and the California Subclass)*

158.    Plaintiff Isip repeats and realleges every allegation set forth in paragraphs 1 through 87.

159.   ILS is a "business" under § 1798.80(a) because it is a "sole proprietorship, partnership, corporation, association, or other group . . . organized . . . under the low of . . . any other state."

160.   Plaintiff Isip and the California Subclass are "customers" under § 1798.80(c) because they provide Confidential Information, which is "personal information" within the meaning of §§ 1798.80(e) and 1798.81.5(d)(1), to ILS for the purpose of obtaining a service from ILS, either directly or indirectly.

161.   ILS conducts business in California and owns or licenses computerized data which includes the personal information of Plaintiff Isip and the California Subclass, within the meaning of Cal. Civ. Code § 1798.82(h).

162.   The CRA requires ILS to "implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." § 1798.81.5(b).

163.   The CRA also requires ILS to "disclose a breach of the security of the system following discovery or notification of the breach in the security of the data . . . The disclosure shall be made in the most expedient time possible and without unreasonable delay." § 1798.82(a).

164.   The CRA also requires ILS to "notify the owner or licensee of the information of the breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." § 1798.82(b).

165.   The Data Breach is the result of ILS's failure to implement and maintain reasonable security procedures and practices to protect the Confidential Information of Plaintiff Isip and the California Subclass, and ILS has therefore violated the CRA.

166.     ILS has further violated the CRA by failing to notify Plaintiff Isip and the California Subclass about the Data Breach expediently, unreasonably delaying such notice, and failing to immediately notify them that their Confidential Information is reasonably believed to have been acquired by an unauthorized person.

167.     ILS's violation of the CRA has injured Plaintiff Isip and the California Subclass, as described above.

168.     Plaintiff Isip and the California Subclass are therefore entitled to damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class set forth herein, respectfully requests the following relief:

A.     That the Court certify this action as a class action and appoint Plaintiffs and their Counsel to represent the Class;

B.     That the Court grant permanent injunctive relief to prohibit and prevent ILS from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.     That the Court award Plaintiff and Class Members compensatory, consequential, and general damages, including nominal damages and punitive damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D.     That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by ILS as a result of their unlawful acts, omissions, and practices;

E.     That Plaintiffs and Class Members be granted the injunctive relief sought herein;

F.     That Plaintiffs and Class Members be granted the declaratory relief sought herein;

G.     That the Court award to Plaintiffs and Class Members the costs and disbursements

of the action, along with reasonable attorneys' fees, costs, and expenses; and

H.     That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and Class Members hereby demand a jury trial in the instant action.

Dated: April 14, 2023

/s/ *John A. Yanchunis*

**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505
jyanchunis@ForThePeople.com

Norman E. Siegel,* Missouri Bar No. #44378
Barrett J. Vahle,* Missouri Bar No. #56674
Benjamin J. Stueve,* Missouri Bar No #71197
Brandi S. Spates, * Missouri Bar No #72144
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com
vahle@stuevesiegel.com
ben.stueve@stuevesiegel.com

Cornelius P. Dukelow,* Oklahoma Bar No. 19086
**ABINGTON COLE + ELLERY**
320 South Boston Avenue, Suite 1130
Tulsa, Oklahoma 74103
(918) 588-3400 (*telephone & facsimile*)
cdukelow@abingtonlaw.com

*\*Pro Hac Vice Forthcoming*
*Counsel for Plaintiffs and the Proposed Class*